TIFFANY O'LEARY,

        Plaintiff,

    v.

COUNTY OF SALEM
CORRECTIONAL FACILITY AND
SHERIFFS OFFICE) and ROWAN
COLLEGE AT GLOUCESTER COUNTY
GLOUCESTER COUNTY POLICE
ACADEMY,

        Defendants.

1:15-cv-03862-NLH-AMD

**OPINION**

**APPEARANCES**:

SARAH F. MEIL
4839 WALTON AVE.
PHILADELPHIA, PA 19143
    On behalf of Plaintiff

THOMAS J. WAGNER
AMY L. WYNKOOP
LAW OFFICES OF THOMAS J. WAGNER
8 PENN CENTER - 6TH FLOOR
1628 JOHN F. KENNEDY BOULEVARD
PHILADELPHIA, PA 19103
    On behalf of Defendant County of Salem

CHRISTINE P. O'HEARN
CHRISTOPHER ALBERT REESE
BROWN & CONNERY, LLP
360 HADDON AVENUE
PO BOX 539
WESTMONT, NJ 08108
    On behalf of Defendant Rowan College at Gloucester County
    Gloucester County Police Academy

**HILLMAN, District Judge**

    Presently before the Court is the motion of Defendants for

summary judgment in their favor on Plaintiff's sex[1] and disability discrimination claims.  For the reasons expressed below, Defendants' motions will be granted in part and denied in part.

## BACKGROUND

Plaintiff, Tiffany O'Leary, began working as a Corrections Officer at Salem County Correctional Facility ("SCCF") on November 8, 2010.  For two years, Plaintiff received positive performance evaluations and got along well with her co-workers.

On December 1, 2012 while working on what is referred to as the "B-Shift," Plaintiff uncovered evidence of illegal drugs being brought into the facility by another corrections officer and a civilian employee who was the son of a former warden of the facility.  Plaintiff reported the activity to her superior officer.  Plaintiff claims, from that point on and for more than a year, she suffered constant and systematic hostility, harassment,

---

[1] Currently, the New Jersey Law Against Discrimination prohibits discrimination based on "sex," "gender identity or expression" and "affectional or sexual orientation."  N.J.S.A. 10:5-12(a).  Prior to the statutory amendment adding "gender identify or expression" and "affectional or sexual orientation" in 2006, the terms "gender" and "sex" were used interchangeably, and the New Jersey courts explained the distinction between sex and gender was that the latter encompassed "whether a person has qualities that society considers masculine or feminine."  Schiavo v. Marina Dist. Development Co., LLC, 123 A.3d 272, 286 (N.J. Super. Ct. App Div. 2015) (citations omitted).  Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., only refers to a person's "sex": employers are prohibited from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

and discrimination – much of it directed at her sex – because of her whistleblowing activity.

On February 28, 2014, Plaintiff's employment with Defendant Salem County changed from a corrections officer to a Salem County Sheriff's Officer Recruit. She left her position at SCCF and began attending the Gloucester County Police Academy at Rowan College at Gloucester County ("RCGC"). During her training, Plaintiff claims that she was discriminated against because of her disabilities, including high blood pressure, asthma, eczema, and hyperhidrosis (excessive sweating) on her hands. Plaintiff claims that she was harassed, and ultimately forced to resign from the police academy on June 11, 2014, because of her disabilities and need for certain accommodations, including being permitted to wear a face mask in cold weather, use an inhaler, and wear gloves during certain training exercises. Plaintiff contends that RCGC's reason for forcing her to resign in lieu of dismissal – that she lied about her completion of a physical training exercise – was a pretext manufactured by the instructors to cover-up the discrimination she suffered based on her disabilities and required accommodations.

Upon her dismissal from the police academy, she could not maintain a position at the Sheriff's Office because she did not complete her training at the police academy. Plaintiff requested that she be permitted to return to SCCF as a corrections officer,

but SCCF denied her request, stating that because her failure to complete the police academy was not due to a medical reason, she was not permitted to return.

On July 10, 2014, Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission (EEOC). On May 12, 2015, the EEOC issued Plaintiff a Notice of Right to Sue.

On June 9, 2015, Plaintiff filed a multi-count complaint against Salem County and RCGC, alleging that they violated the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1 et seq., the Americans with Disabilities Act (ADA), 42 U.S.C. § 12111 et seq., Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the New Jersey Contentious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 et seq., by discriminating against her and retaliating against her due to her gender, disabilities, and whistleblowing activity. Defendants have moved for summary judgment in their favor on all counts. Plaintiff has opposed Defendants' motions.

**DISCUSSION**

### A. Subject matter jurisdiction

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff brings claims arising under federal law. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

**B.    Summary judgment standard**

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or

otherwise, specific facts showing that there is a genuine issue for trial. Id. Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

### C. Analysis

#### 1. Plaintiff's claims against Salem County

Plaintiff's claims against Salem County consist of a claim for hostile work environment in violation of the Title VII and the NJLAD, and a claim for wrongful termination in violation of Title VII, the NJLAD, and CEPA.[2] Salem County has moved for summary judgment, arguing that it is entitled to judgment in its favor because Plaintiff's evidence cannot support her claims of discrimination. Salem County also argues that Plaintiff's CEPA claim is not viable because it is outside the scope of her EEOC charge since her charge does not discuss her reporting the illegal drug activity and any resulting repercussions.[3]

---

[2] Plaintiff has relinquished her claims against Salem County for violations of the NJLAD and ADA based on her disabilities. Salem County is therefore entitled to judgment in their favor on those claims.

[3] Salem County also argues that Plaintiff's CEPA claim is otherwise untimely and barred by CEPA's statute of limitations because her

Addressing Salem County's argument about Plaintiff's CEPA

claim first, unlike Plaintiff's claims for violations of federal

employment discrimination laws, Plaintiff is not required to

exhaust any administrative remedies prior to bringing a CEPA

claim.  See Barzanty v. Verizon Pennsylvania, Inc., 361 F. App'x

411, 413 (3d Cir. 2001) (citing Burgh v. Borough Council, 251 F.3d

465, 470 (3d Cir. 2001)) (explaining that a plaintiff bringing an

employment discrimination claim under Title VII must comply with

---

complaint was filed more than a year after her departure from
SCCF.  The basis for this argument is that Plaintiff served as a
corrections officer from November 8, 2010 until February 28, 2014,
at which time she voluntarily separated from employment to take a
position at the Sheriff's Office.  Because Plaintiff did not file
her suit against Salem County until June 9, 2015, Plaintiff's CEPA
claim is outside of CEPA's one-year statute of limitations.

As Plaintiff points out, even though Plaintiff changed positions
from a corrections officer to a Sheriff's Office recruit, she
remained employed by Salem County the entire time.  Plaintiff
argues that her claim is based on her forced resignation from the
police academy and Salem County's refusal to allow her to continue
employment with the County at SCCF.  Thus, Plaintiff argues that
the final adverse employment action arising from her
whistleblowing activity occurred on June 12, 2014, which makes her
June 9, 2015 complaint against Salem County timely.

Other than SCCF employee recollections and basic human resources
paperwork, Salem County does not offer evidence to refute
Plaintiff's contention that she remained a Salem County employee
from November 2010 through June 12, 2014, even though she switched
positions within two different County organizations.  Indeed,
Plaintiff has provided the Personnel Action Form prepared by Salem
County to document Plaintiff's termination, which states that her
dates of employment were from November 8, 2010 to June 12, 2014,
with no break in service. (See Docket No. 73-2 at 704-05.)  At
most, this is a disputed issue that must be submitted to the jury
for resolution.  It is not a basis to dismiss Plaintiff's CEPA
claim.

the procedural requirements set forth in 42 U.S.C. § 2000e-5, and before filing a lawsuit, a plaintiff must exhaust her administrative remedies by filing a timely discrimination charge with the EEOC); Lippman v. Ethicon, Inc., 119 A.3d 215, 230, 222 N.J. 362, 388 (N.J. 2015) (holding that CEPA does not contain an exhaustion requirement); Skoorka v. Kean University, 2015 WL 3533878, at *20 (D.N.J. 2015) (explaining a CEPA retaliation claim may be based on an employee's report of virtually any unlawful practice, and a Title VII retaliation claim must be based on an employee's report of a violation of Title VII itself). Thus, to the extent that Plaintiff's EEOC charge does not mention her reporting the illegal drug activity, such omission does not preclude her claim under New Jersey's CEPA law.

With regard to Plaintiff's retaliation claim premised on Salem County's alleged violation of Title VII, the relevant test in determining whether a plaintiff has exhausted her administrative remedies, is "whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." D'Ambrosio v. Cresthaven Nursing & Rehabilitation Center, 2016 WL 5329592, at *6 (D.N.J. 2016) (citing Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984) (per curiam); Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996) ("Requiring a new EEOC filing for each and every discriminatory act would not serve the purposes of the

8

statutory scheme where the later discriminatory acts fell squarely within the scope of the earlier EEOC complaint or investigation.")) (other citations omitted).  A plaintiff's suit will not be barred for failure to exhaust administrative remedies if the "core grievances" in the Title VII suit filed and the earlier EEOC complaint are the same.  Id. (citing Waiters, 729 F.2d at 237 (holding that the plaintiff's suit was not barred for failure to exhaust administrative remedies because his Title VII suit alleging retaliatory firing shared the same core grievance as the earlier EEOC complaint charging retaliatory employment restrictions); Antol, 82 F.3d at 1291 (finding that an initial EEOC charge of disability discrimination cannot fairly encompass a subsequent Title VII claim of gender discrimination)).

Here, Plaintiff's charge filed against Salem County mainly relates to her transfer to the Sheriff's Office on February 24, 2014 and the alleged discrimination she suffered by the Sheriff's Office during her time at the police academy.  (Docket No. 64-5.) The only reference to her time as a corrections officer at SCCF is one sentence: "I had previously worked for Salem County Correctional Facility, and I complained of sex discrimination there."  (Id.)

Plaintiff could maintain a Title VII claim against Salem County regarding her whistleblowing activity if her EEOC charge could be fairly read to claim that Salem County discriminated and

retaliated against her in violation of Title VII arising out of her reporting the illegal drug activity. Plaintiff's charge, however, gives no indicated of what gave rise to the alleged sex discrimination at SCCF, and the "core grievance" of her charge concerns what occurred upon her transfer to the Sheriff's Office. Thus, Plaintiff cannot maintain a Title VII retaliation claim against Salem County specifically concerning her whistleblowing activity.

This discrete carve out of Plaintiff's claims against Salem County does not affect substantively the analysis of the remainder of Plaintiff's claims against Salem County. Plaintiff argues that the existence of disputed material facts permits her to proceed with her claims against Salem County under CEPA for retaliation for her whistleblowing, and proceed with her claims against Salem County under the NJLAD and Title VII for sex discrimination and harassment while she served as a corrections officer and at the Sheriff's Office.[4] The Court agrees.

The legal standards for Plaintiff's claims serve as a roadmap to assess the evidence Plaintiff presents to support those claims.

_____

[4] A plaintiff may not maintain a claim for retaliation for a CEPA protected activity in tandem with a retaliation claim under the NJLAD. See N.J.S.A. 34:19-8 (providing that when a plaintiff files an action under CEPA, other state law retaliation claims are waived). Plaintiff recognizes CEPA's waiver position, and clarifies that she is not asserting a claim for retaliation under the NJLAD.

To establish a *prima facie* CEPA action, a plaintiff must
demonstrate that: (1) he or she reasonably believed that his or
her employer's conduct was violating either a law, rule, or
regulation promulgated pursuant to law, or a clear mandate of
public policy; (2) he or she performed a "whistle-blowing"
activity described in N.J.S.A. 34:19-3 [relevant here,
"[d]iscloses . . . to a supervisor . . . an activity, policy or
practice of the employer," N.J.S.A. 34:19-3(a)]; (3) an adverse
employment action was taken against him or her; and (4) a causal
connection exists between the whistle-blowing activity and the
adverse employment action. Lippman v. Ethicon, Inc., 119 A.3d
215, 226 (N.J. 2015) (citations omitted).

Under Title VII, it is unlawful for an employer "to
discriminate against any individual with respect to his
compensation, terms, conditions, or privileges of employment,
because of such individual's . . . sex." 42 U.S.C. § 2000e-
2(a)(1). Under the NJLAD, it is unlawful "[f]or an employer,
because of the . . . sex . . . of any individual . . . to
discriminate against such individual in compensation or in terms,
conditions or privileges of employment." N.J.S.A. 10:5-12(a).
Title VII and the NJLAD also prohibit sexual harassment – creating
a hostile work environment - because it is a form of sex
discrimination. Moody v. Atlantic City Board of Education, 870
F.3d 206 (3d Cir. 2017) (citing Meritor Sav. Bank, FSB v. Vinson,

477 U.S. 57, 65-66 (1986); Lehmann v. Toys 'R' Us, Inc., 626 A.2d 445, 452 (N.J. 1993) (explaining that the New Jersey Supreme Court "has frequently looked to federal precedent governing Title VII" to interpret and apply the NJLAD)).

To succeed on a hostile work environment claim against the employer, a plaintiff must establish that: 1) the employee suffered intentional discrimination because of her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability. Id. (citations omitted). To establish a *prima facie* case of sex discrimination under either the federal or state statute, a plaintiff must first establish that: (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination. Tourtellotte v. Eli Lilly and Co., 636 F. App'x 831, 842 (3d Cir. 2016) (citing Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999)) (other citations omitted).

A plaintiff can prove her discrimination claims through direct or circumstantial evidence. Under the framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the

plaintiff must first establish a *prima facie* case of discrimination, which creates an inference of unlawful discrimination. <u>Willis v. UPMC Children's Hosp. of Pittsburgh</u>, 808 F.3d 638, 643–45 (3d Cir. 2015). Once the plaintiff has successfully established a *prima facie* case creating an inference of discrimination, the burden shifts to the employer who must articulate a legitimate nondiscriminatory reason for the adverse employment action. <u>Id.</u> (citations omitted). This second step of <u>McDonnell Douglas</u> does not require that the employer prove that the articulated legitimate, nondiscriminatory reason was the actual reason for the adverse employment action, but instead the employer must provide evidence that will allow the factfinder to determine that the decision was made for nondiscriminatory reasons. <u>Id.</u> (citations omitted).

If the employer satisfies this second step, the burden shifts back once more to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual – that not only was the employer's proffered reason false, but the real reason was impermissible discrimination. <u>Id.</u> This can be done in two ways: (1) by pointing to evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action by showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons, or (2) by pointing to evidence that would allow a factfinder to believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action, which can be shown by (1) the defendant having previously discriminated against the plaintiff; (2) the defendant having discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably. Id. (citations and quotations omitted).

In contrast to circumstantial evidence, direct evidence of discrimination is so revealing of discriminatory animus that it is unnecessary to rely on the McDonnell Douglas burden-shifting framework. Anderson v. Wachovia Mortgage Corp., 621 F.3d 261, 269 (3d Cir. 2010). Once a plaintiff produces such evidence, the defendant has the burden of producing evidence to show that it would have made the same decision in the absence of discriminatory animus. Id. (citation omitted). To qualify as direct evidence, the evidence must be such that it demonstrates that the decision-makers placed substantial negative reliance on an illegitimate criterion in reaching their decision. Id.

Direct evidence must satisfy two requirements: (1) the evidence must be strong enough to permit the factfinder to infer that a discriminatory attitude was more likely than not a motivating factor in the defendant's decision; and (2) the

evidence must be connected to the decision being challenged by the plaintiff.  Id. (citations omitted).  Moreover, any statements made by a defendant's employees must be made at a time proximate to the challenged decision and by a person closely linked to that decision.  Id. (citation omitted).  These requirements are a high hurdle for plaintiffs.  Id. (citation omitted).

Plaintiff presents dozens of incidents she claims support her CEPA, discrimination and harassment claims:

- Plaintiff testified that on December 12, 2012, Captain Lape called her into his office, berated her for writing the report about drugs being brought into the facility and threatened her future career prospects in law enforcement: "Captain Lape pulled me into his office… and told me that I was harassing Officer Kent. And also, I was – for me reporting officers in the facility, I would never become a State Trooper and I could be written up for reporting officers. I would never become a State Trooper, it would be filed downtown and so on."

- Captain Lape moved Plaintiff to A shift in retaliation for her reporting illegal activities of Officer Kent because:

  - Captain Lape was angry with Plaintiff for reporting Officer Kent since he berated Plaintiff for doing so and threatened her future career prospects.

  - Captain Lape testified that he moved Plaintiff to A shift because Officer Kent had taken a leave of absence to go to a drug rehabilitation program and he consequently needed a female officer on A shift and Plaintiff had the lowest seniority of all other females, but this was not true, as Officer Kent did not leave to go to rehab until sometime after January 23, 2013, the shift was not otherwise short-staffed with females, and Plaintiff was not the lowest female officer in seniority, even as of 7 months earlier in April 2012.

- Even assuming that an additional female was needed on A shift, Captain Lape admitted that his normal procedure for filling that shift would have been to post it so any officers interested could take it, but Captain Lape further admitted that he did not post the shift, nor did he ask any of the other officers on B shift if they could move to A shift, and since both A shift and B shift worked 7am-7pm, 2 days on and 2 days off, for most employees it would not make any real difference if they worked A shift or B shift.

- Almost immediately after she reported illegal activities at the jail, Plaintiff found herself the subject of frequent harassment:

  - Superior officers joked about Plaintiff sleeping with a superior officer and his wife (which was untrue).

  - Officer Richard Pierce testified that "even after this incident was documented, comments [insinuating that Plaintiff was or would be having a sexual relationship with Lieutenant Dilks] never stopped" and continued throughout the remainder of her employment.

  - Officers made fun of Plaintiff because she suffered from eczema or psoriasis, frequently "mak[ing] insinuations about other parts of her body … about personal areas of the body … her vagina."

  - Officers and supervisors also made comments about Plaintiff's sexual orientation, suggesting in a derogatory fashion that she was a lesbian.

  - Sergeant Templeton told Plaintiff she was going to be very lonely at work and she should "go fuck yourself."

  - Officer Pierce confirmed that both officers and supervisors were involved in making such comments and that: "This was, unfortunately, for [Plaintiff], it was the general atmosphere, unfortunately."

  - Negative comments about Plaintiff were made on a weekly basis.

o Officer Deborah Preston told Plaintiff that she was trying to "hem [her] the fuck up" and threatened to "punch [her] in the fucking face." Plaintiff testified that a few days after she reported Officer Preston's inappropriate language towards her, she put her hand on her car door handle to open it and found it covered in spit. Plaintiff went immediately inside the facility and told Deputy Warden Anthony Wright what had occurred. Plaintiff testified that she and Wright viewed the video of Officer Preston walking towards her car which was parked in the opposite direction of the entrance to the building. There was no reason for Officer Preston to be walking towards Plaintiff's car instead of going in to work.

o Plaintiff described how Officer Preston's threats to beat her up were particularly disturbing in the environment of the jail: "You're already in an environment where it's unsafe. You're in a dangerous situation, so you spoke of earlier, that a correctional facility is a very dangerous place to work. And then you're having officers that are acting unprofessional in front of inmates and doing all this inside of the facility, even outside of the facility, which causes a hostile work environment."

o Plaintiff also described how Lieutenant Mills, Sergeant Templeton, and Officer Carr were permitted to yell at her and belittle her in front of inmates. Being treated this way by other officers, including superior officers, put her personal safety in danger at the jail: "So an inmate sees you acting out in front of another officer and thinks it's ok, they're going to act out and potentially harm me or harm anybody else when they see the response team acting this way. And the response team is who responds to incidents… [I felt unsafe because] I didn't feel like they would respond to different situations."

o In May 2013, Officer Carr refused to stay in the unit when Plaintiff strip searched an inmate, violating jail protocol and putting her personal safety at risk. Plaintiff radioed for an officer to help her, but Officer Carr then radioed back to

cancel Plaintiff's request. Sergeant Templeton then came on the radio and taunted Plaintiff, asking if she was "scared" and needed someone to "protect" her. Plaintiff responded that a second officer during strip searches was jail policy.

o Several corrections officers frequently insinuated that Plaintiff was a "snitch": Captain Dilks testified that after Plaintiff reported Officer Kent, Officers Carr, Welsh and Watt all told her they did not like Plaintiff, and each of these officers told Captain Dilks that Plaintiff was a "snitch."

o Officer Welch made comments about Plaintiff to the effect of: "write her the fuck up, get her in trouble, she's a troublemaker, she wants to follow the rules and get people in trouble. We're going to get her in trouble."

o Officer Michael Shannon was upset about Plaintiff's protected activity. He told Plaintiff that Officer Kent would be fired and would then be unable to support her family.

o Plaintiff testified that the very day she was transferred to the Sheriff's Department, Undersheriff Warren Mabey called her a "troublemaker" at the jail. Sheriff's Officer Sergeant Sean Phillips also told Plaintiff that the Sheriff's Office considered her to be a "troublemaker."

o Both Captain Lape and Deputy Warden Wright testified that Plaintiff was good at her job as a Salem County Corrections Officer and never received any discipline in that position. Plaintiff's performance evaluation for the period December 2012 to December 2013 rated her as "exceeds expectations" or "meets expectations" in every category. Contradicting the testimony of Captain Lape and Deputy Warden Wright, as well as Plaintiff's documented excellent performance evaluation, Warden Skradzinski testified he concluded that Plaintiff was not a good corrections officer because she "interrogated inmates more so than attending to the inmate needs of the unit." But when pressed, Skradzinski could not recall any

specifics of these purported interrogations other than the incident with Officer Kent. He could not recall receiving any reports of these purported interrogations and no one else told him that she was doing these purported interrogations.

- Despite widespread knowledge by Human Resources, the warden, and the deputy warden that Plaintiff was being harassed, no one was ever disciplined in connection with the harassment. Instead, two of the main culprits were promoted.

- Undersheriff Mabey called Plaintiff a "troublemaker" on her first day, and Mabey was also the Salem County employee directly responsible for ensuring that Sheriff Miller would not allow Plaintiff to return to employment as Salem County. He told Sheriff Miller that Plaintiff had an "integrity issue," but admitted that he had no clear understanding of what the issue was, had never asked the academy to explain the issue, had never requested or reviewed any documents or evidence and had not even asked Plaintiff for her side of the story.

- Other similarly situated Officers who left SCCF to pursue opportunities elsewhere were permitted to return to SCCF when those opportunities did not work out, but Plaintiff was not allowed to do so. For example, in 2010, Officer Pierce resigned his position as a Salem County Corrections Officer to accept a job with the New Jersey State Department of Corrections. That job was contingent upon him attending the State Corrections academy. Officer Pierce did not complete the academy because he could not complete the Physical Training requirements. Salem County took him back as a Corrections Officer after that.

- Salem County was hiring corrections officers – and was particularly in need of female officers – when it refused to allow Plaintiff to return to that position. Warden Skardzinski and Sheriff Miller confirmed that there was "a huge turnover at the correctional facility" and female officers – especially those already PTC certified like Plaintiff – were always in high demand. Initially, when Plaintiff requested to return to her position as a corrections officer, Sheriff Miller told her that he did not have a place for her. But at deposition, Sheriff Miller admitted

19

that explanation was false and changed his story to say that Plaintiff was not permitted back because of "integrity issues" – the circumstances of which he knew almost nothing.

- Salem County treated Plaintiff differently than other similarly situated officers who were proven to have serious "integrity issues" by submitting forged documents and lying to their superiors. Unlike Plaintiff, both of those officers were permitted to tell their sides of the story prior to being disciplined. Also unlike Plaintiff, both of these officers were allowed to keep their jobs even when it was conclusively proven that they had integrity issues. In June 2016, one corrections officer submitted to Salem County a medical request note that he be allowed to roll up his sleeves while working. The note was from a physician who had never seen or examined the officer.  In fact, the physician is an OB/GYN who only treats female patients.  After investigation, it was discovered that the doctor who purportedly wrote the note had not written it at all. The note had been forged by the officers' girlfriend. In January 2016, another corrections officer submitted an intentionally falsified document purporting to be an excuse from work note signed by the chief of a fire company.  When questioned about the falsified document, the officer lied and said that it was authentic.  Salem County proved that the officer was lying when the chief confirmed that he had not written the note the officer submitted.

Based on the foregoing, Plaintiff argues that she has established a *prima facie* case under CEPA and presented material disputed facts for a jury to consider her claim, because the only time period after her protected activity that Plaintiff was not subjected to harassing comments and being called a "snitch" was when she was absent from the job site at the academy.  Plaintiff argues that a jury is entitled to infer from the contrast between Salem County's favorable treatment of Plaintiff before she engaged

in protected activity and its harassing treatment of her after she engaged in protected activity that there is a causal connection between her protected activity and the adverse action taken against her.

With regard to her sex discrimination and hostile work environment claims, Plaintiff argues in addition to establishing a *prima facie* case of retaliation, she has put forth ample evidence that Salem County's purported reason for terminating her employment and not allowing her to return to work as a corrections officer was a pretext for retaliating against her because of her protected activity. Plaintiff also argues that the evidence shows that she suffered from sex-based harassment, was treated differently than similarly situated males, and her so-called integrity issue was a pretext for discrimination.

Salem County challenges Plaintiff's proffered evidence by providing competing testimony of the parties involved, arguing how Plaintiff's evidence should not be interpreted as discriminatory or harassing, and contending that Plaintiff caused her own difficulties because she has an abrasive personality.

All of Salem County's arguments are not for this Court to assess. Plaintiff has readily met the elements of her *prima facie* case for her CEPA, discrimination and hostile environment claims, and Plaintiff has provided ample evidence to rebut Salem County's purported legitimate actions. A jury must assess Salem County's

evidence against Plaintiff's evidence to determine who and what to credit.  Accordingly, SCCF's motion for summary judgment on these claims must be denied.

### 2. Plaintiff's claims against Rowan College at Gloucester County

Plaintiff claims that Rowan College at Gloucester County (RCGC) discriminated against her in violation of the NJLAD based on her disabilities.[5]  Disability discrimination claims under the NJLAD are analyzed under the same framework as the ADA.  Guarneri v. Buckeye Pipe Line Services Co., 205 F. Supp. 3d 606, 614 (D.N.J. 2016) (citing Joseph v. New Jersey Transit Rail Operations Inc., 586 Fed. Appx. 890, 892 (3d Cir. 2014) (citing Victor v. State, 203 N.J. 383, 4 A.3d 126, 145 (2010)) (other citations omitted).  To state a *prima facie* cause of action for disability discrimination, the employee must show the following: (1) the employee was disabled;[6] (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she has suffered an

_____

[5] Plaintiff is no longer pursuing claims against RCGC under the ADA or for its failure to make accommodations for her disability.  She has also abandoned her sex discrimination claims against RCGC.

[6] The NJLAD refers to "handicap," but defines handicap as a disability.  Foster v. National Gypsum Services Company, 2016 WL 4257772, at *4 n.5 (D.N.J. August 11, 2016) (citing Victor v. State, 4 A.3d 126, 135 (N.J. 2010) (explaining that courts have used the terms interchangeably).

otherwise adverse employment decision as a result of discrimination. Id.

Plaintiff claims that she was taunted and singled out because of her requests for special accommodations and her availment of those accommodations. Plaintiff claims that from the first day of her training, the lead instructor, Rachel Baum, endeavored to push her out of the police academy because of her disabilities. Plaintiff claims that when she would not quit because of Baum's and other instructors' harassment, and because she was passing her physical fitness requirements, they manufactured a reason for her forced resignation – that she lied she had completed 20 burpee[7] exercises when she had not.

RCGC argues that it provided Plaintiff with every accommodation she requested, and that her disability discrimination claim fails because Plaintiff cannot demonstrate that her purported forced resignation was discrimination motivated by her disabilities.[8]

---

[7] A burpee is another name for a squat thrust.

[8] The NJLAD defines "disability" as physical disability, infirmity, malformation or disfigurement which is caused by bodily injury . . . which shall include, but not be limited to, . . . lack of physical coordination, . . . resulting from anatomical . . . physiological . . . conditions which prevents the normal exercise of any bodily . . . functions or is demonstrable, medically . . . by accepted clinical or laboratory diagnostic techniques. . . ." N.J.S.A. 10:5-5(q). RCGC does not dispute that Plaintiff is considered to have a disability under the NJLAD.

To support her disability discrimination claims, Plaintiff
points to the following:

- As soon as Plaintiff began having problems with her blood
pressure, Lead Instructor Baum began making disparaging
comments to her. Lead Instructor Baum told Plaintiff that she
did not belong in the academy because of her blood pressure.
She further told Plaintiff "you're not going to graduate this
academy. You know, early on, in March, when I first – you can
continue to do – I forget the exact wording that she said.
But basically along the lines of you're not going to graduate
the academy as far as I'm concerned." Lead Instructor Baum
began making these comments the week following Plaintiff's
elevated blood pressure reading – before any physical fitness
assessments or academic tests were completed.

- Plaintiff passed every physical fitness assessment she was
given, which were graded pass/fail.  While Plaintiff was
slower than most of the class in running, she did push-ups
and sit-ups faster than half her class. Though Plaintiff was
sometimes slower than some of her classmates, she always
finished every required exercise.  By May 13, 2014,
Plaintiff's PT Assessment Score had improved dramatically
from 72.2 to 84.4, and Director Madden considered her to be
"doing good" in physical training.

- The first request for an accommodation that Plaintiff made at
the beginning of the police academy was to have her inhaler
for her asthma placed in the medical bag that is taken to all
physical training.  Despite purportedly accommodating
Plaintiff's use of an asthma inhaler, Lead Instructor Baum
and Instructor Walker attempted to embarrass Plaintiff in
front of her class because she needed to use her asthma
inhaler after PT was over for the day.  They repeatedly said
"everybody, let's stop for O'Leary. She can't breathe."

- After receiving medical documentation, the police academy
granted Plaintiff's request to wear the mask every time she
needed it. Though they allowed Plaintiff to wear the mask,
academy instructors frequently chastised Plaintiff for
wearing her mask in the cold.  Instructors Walker, Baum and
Hoffman repeatedly said "we have to wait for the Ninja" to
put her mask on.

- Despite purportedly granting Plaintiff the accommodation of
wearing gloves, Academy instructors made fun of her for

wearing them.  After Plaintiff provided a doctor's note
stating that she needed to wear gloves due to hyperhidrosis,
she was told by Instructor Walker that she could not wear the
gloves during baton practice.  Instructor Hayes asked her "do
you want to look like a friggin retard wearing gloves?"  When
Plaintiff informed Instructor Walker that she could not
perform the baton exercise correctly because her hands were
sweaty, she was given demerits for being "disrespectful" to
him.  After it became obvious that Plaintiff could not
properly maneuver the baton without gloves, Instructor Walker
called her out and embarrassed her in front of the entire
class, describing how sweaty her hands were.

- Plaintiff was first disciplined on May 12, 2014, when she
  received 2 demerits for unpreparedness for not having the
  police academy Honor Code memorized after stating that she
  had memorized it.  Demerits were given to many members of
  Plaintiff's class for an assortment of minor issues.
  Demerits given to Plaintiff for issues other than the
  incident for which she was ultimately dismissed are
  irrelevant in this case because Director Madden testified
  that the only reason for her dismissal was that Baum accused
  her of lying about the number of burpees she did on June 11,
  2014.

- RCGC contends that Lead Instructor Baum suspected that
  Plaintiff was cheating on the number of exercises she was
  completing and that she was not doing the full number of
  exercises as directed because she ran her sprints at a slower
  pace than other recruits in her class, yet finished her
  exercises ahead of the other recruits. Plaintiff contends
  that even though she was often slower than some of her
  classmates in completing required exercises, she always
  completed the required number.  Plaintiff always maintained
  and continues to maintain that she did 20 burpees.  Baum says
  she only did 16.

- The recruits were instructed to do 20 burpees, and Lead
  Instructor Baum and Instructor Hoffman stood directly behind
  Plaintiff while she performed her burpees in order to observe
  her and determine if in fact she was actually completing the
  number of exercises as directed.  It is undisputed that the
  recruits were instructed to do 20 burpees. It is disputed
  that Lead Instructor Hoffman was standing directly behind
  Plaintiff. Plaintiff testified that she heard Instructor
  Hoffman's voice coming from off her left side while she was
  doing the burpees.  Instructor Hoffman, by contrast,
  maintains that he was standing behind her.  In any event,

Instructor Hoffman admits that he did not count the number of burpees Plaintiff did.

- RCGC contends that both Lead Instructor Baum and Instructor Hoffman observed that Plaintiff performed her repetitions at a slower pace than the rest of the class, and Instructor Baum counted that Plaintiff had performed 16 repetitions, and then stopped and stood up when the rest of the class stopped. Plaintiff contends that she did 20 burpees, and Instructor Hoffman admits that he did not count the number of burpees Plaintiff did. Because various recruits in the 30+ member class did the exercises at different paces, the class did not all stand up at the same time, making it impossible for him to know how many exercises Plaintiff had done simply by when she stood up.

- RCGC contends that Lead Instructor Baum interviewed recruits R.P. and S.L. and asked if they had heard Plaintiff counting her exercises out loud, which the recruits were required to do. R.P. indicated that he had not heard Plaintiff and was sent back to the gym. S.L. indicated that he had heard Plaintiff counting and that he only heard her count to 15 and then jump to 19 before she stood up as if she was done her exercises. In response, Plaintiff contends that the reason Baum chose R.P. and S.L. to put on either side of Plaintiff is highly suspect. Director Madden testified that even though R.P. passed his first PT assessment with a "pretty good score" – higher than Plaintiff's score – he suspended him and threatened to kick him out of the academy anyway because his score was not as high as Director Madden thought it should be. Director Madden also suspended S.L. and threatened to kick him out of the academy for lack of physical fitness even though he too passed his first PT assessment with a higher score than Plaintiff. These were the only two recruits that Director Madden suspended for lack of physical fitness. Plaintiff argues that R.P. and S.L. were the two recruits most likely to be jealous of Plaintiff because they were held to higher standards by the director of the academy. Plaintiff also argues that S.L. did not hear Plaintiff counting because Baum testified that because the 30+ recruits were all counting out loud at the same time, there was no way to distinguish Plaintiff's voice from any of the other recruits, and S.L. was himself counting his own repetitions out loud while engaged in strenuous physical exercise. Plaintiff further points out that S.L.'s verbal statement to Baum differs from his written statement – he told Baum verbally that he heard Plaintiff count to 15, then say 20 and stand up, but S.L. wrote that Plaintiff said 19 and stood up.

- RCGC argues that Lead Instructor Baum then ordered Plaintiff to go to the showers, but Plaintiff disobeyed this direct order and returned to the gym. Plaintiff testified that she believed she was required to be in formation with her class before going to the showers. Director Madden testified that Plaintiff going to the gym instead of the showers had nothing to do with her dismissal from the academy.

- RCGC contends that Lead Instructor Baum reported the June 11, 2014 incident to Director Madden because lying is a violation of the Honor Code. However, Plaintiff contends that prior to Director Madden deciding to dismiss Plaintiff, Lead Instructor Baum told Plaintiff in front of the entire class that she was no longer a part of the class.

- Director Madden then called the members of the Advisory Board and convened a hearing for later that day. Plaintiff was not permitted to call witnesses on her behalf, speak to other potential witnesses, to be present for testimony against her or to ask witnesses against her questions.

- Despite making the decision to dismiss Plaintiff or allow her to resign in lieu of termination, Director Madden never spoke with her about the accusations against her and never gave her an opportunity to tell him her side of the story.

- Director Madden threatened Plaintiff that she would be "done in law enforcement, period" if she did not resign.

- RCGC contends that Plaintiff drafted a resignation letter and gave it to Director Madden, but Plaintiff contends that Director Madden dictated the contents of the letter to Plaintiff.

- Plaintiff and Je.D. were the only recruits that Baum said she subjected to surreptitiously counting the number of exercises they did. Director Madden gave Je.D. the choice to resign or be dismissed, and Je.D. chose to be dismissed. Plaintiff claims that this is relevant because Je.D. also suffered from a disability.

- Non-disabled recruit G.P. was accused and found by the Advisory Board to be lying. Unlike Plaintiff, he was not dismissed or told to resign in lieu of dismissal. G.P. was accused of sexually harassing female recruits and staff. When confronted with the allegations against him, G.P. denied

them. The Advisory Board ultimately determined that G.P. was lying and that he had, in fact, sexually harassed female recruits and staff while at the academy. Despite the Advisory Board's determination that he was lying, G.P. was not expelled or forced to resign from the academy.

Based on the foregoing, Plaintiff argues that Baum's motive for contending that Plaintiff failed to do the required number of exercises is a material fact in dispute. If the jury believes Plaintiff's testimony that she did always complete the number of exercises, then the jury could conclude that Lead Instructor Baum had no legitimate reason to suspect that Plaintiff was cheating on the number of exercises she completed. Coupled with the discriminatory comments, and unequal discipline regarding physical fitness and integrity issues, the lack of a legitimate reason for Baum's targeting of Plaintiff would permit the jury to infer a discriminatory motive.

In contrast, RCGC argues that even if the instructors' taunting of Plaintiff for her disability accommodations were true, Plaintiff lying as to the number of burpees she completed was a legitimate reason for her dismissal from the police academy. RCGC also argues that Plaintiff's comparison to other recruits and their discipline does not evidence discriminatory intent because those recruits' situations differed from Plaintiff's. RCGC further argues that one comparator, Je.D., was not actually disabled but faced the same treatment as Plaintiff – dismissal for lying about exercise completion – which evidences that RCGC

treated all recruits the same regardless of disability.[9]

Plaintiff's NJLAD disability discrimination claim follows the McDonnell Douglas burden shifting analysis set forth above, and the parties' evidence presents the classic case where a jury must decide which side to believe. RCGC has articulated several purported legitimate reasons for Plaintiff's dismissal from the police academy,[10] and Plaintiff has challenged those reasons through her testimony, testimony of others, and other circumstantial evidence, which, if believed by a jury, could undermine RCGC's reasons for termination and reveal discriminatory animus. The Court cannot make that determination because the outcome depends in large part on weighing the credibility of the

_____

[9] RCGC also contends that it is entitled to partial summary judgment for claims regarding front-pay and reinstatement because after Plaintiff was dismissed from the academy, they determined that she plagiarized portions of her staff study report without citations, and she would have been terminated for that infraction even if she had not been terminated for lying on her exercises. Plaintiff counters that there was no direction on how to complete the staff study report, there was no requirement regarding citations, and no other reports included such citations. Plaintiff also argues that RCGC has not provided evidence that any other recruit's staff study report has been scrutinized for plagiarism, or that any other recruit was terminated because of it. These positions present a typical disputed issue of material fact that a jury must assess.

[10] RCGC does not challenge that Plaintiff has met her *prima facie* case for disability discrimination, which is a relatively easy burden to meet. See Scheidemantle v. Slippery Rock University State System of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006) ("[T]there is a low bar for establishing a *prima facie* case of employment discrimination." (citations omitted).).

parties and witnesses.  Consequently, RCGC is not entitled to summary judgment on Plaintiff's disability discrimination claims under the NJLAD.

## CONCLUSION

Whether Plaintiff was subjected to retaliation for reporting illegal activity or suffered discrimination because of her sex at SCCF, and whether Plaintiff was dismissed from RCGC because of her disability, instead of legitimate non-discriminatory or retaliatory reasons for those actions, is for a jury to determine. Accordingly, Defendants' motions for summary judgment on the claims in Plaintiff's complaint that encompass those issues must be denied.  Defendants are entitled to summary judgment on the claims that Plaintiff has determined to no longer pursue, as well as for Plaintiff's retaliation claim under Title VII against Salem County.

An appropriate Order will be entered.


Date: __October 12, 2017__          _____s/ Noel L. Hillman_____
At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.